IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JAMES EARL SMITH                                                          PLAINTIFF

           v.                Civil No. 1:06-cv-01034
                            Civil No. 1:06-cv-01036
                            Civil No. 1:06-cv-01045

SHERIFF CALVIN KNIGHTON;
CAPTAIN VICTOR REYNOLDS;
and LT. DELANEY                                                  DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff, James Earl Smith, (hereinafter "Scott" or "Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Smith is currently incarcerated at the Tucker Unit of the Arkansas Department of Correction. In these consolidated actions, Smith contends his constitutional rights were violated while he was incarcerated in the Columbia County Detention Facility. Specifically, he contends he was subjected to unconstitutional conditions of confinement and his due process rights were violated when he was placed on administrative segregation.[1]

Defendants filed a summary judgment motion (Doc. 19). To assist Smith in responding to the motion, a questionnaire was propounded (Doc. 24) by the Court. Smith filed a timely response to the questionnaire (Doc. 25). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

---

[1] Smith also has a separate lawsuit pending, *Smith v. Knighton, et al.,* Civil No. 1:06-cv-01035, in which he contends he was denied adequate medical care, excessive force was used against him, and he was deprived of his personal property without due process of law.

## 1. Background

Smith was booked into the Columbia County Detention Facility (CCDF) on June 21, 2005, on charges of breaking and entering and theft of property. *Plaintiff's Response* (*hereinafter Resp.*) (Doc. 25) at ¶ 1. His bond was set at $5,000. *Id.* at ¶ 2. The pending criminal charges were the sole reason Smith was incarcerated. *Id.* at ¶ 3.

On July 3, 2005, Smith was housed in pod 8 at the CCDF. *Resp.* at ¶ 4. That day, the detainees in pod 8 tore down the padlocked door in the ceiling of pod 8 in an attempt to escape. *Defendants' Exhibit* 1 at page 1 (*hereinafter Defts' Ex.*). According to Smith, he was in pod 8; However, he asserts he told Officer Smith that the padlocked door was down and the officer replied that he didn't care he was going home and he would tell the next officer. *Resp.* at ¶ 5.

All detainees, including Smith, were moved out of pod 8 and into pod 4. *Resp.* at ¶ 6. Smith denies that he was one of the detainees who attempted to escape from pod 8. *Id.* at ¶ 7(A). Smith was charged with escape from a correctional facility, breaking or entering, and theft of property as a result of the July 3rd incident. *Id.* at ¶ 7(B). Smith indicates he was not found guilty of these charges. *Id.*

On July 4th, according to defendants, the detainees in pod 4 were to be denied yard call due to the escape attempt the prior day. *Defts' Ex.* 1 at page 2. However, by accident defendants indicate Smith was let out on yard call. *Id.* Smith agrees he was let out on yard call but contends it was not an accident. *Resp.* at ¶ 8.

Defendants' records indicate Smith bonded out of the CCDF on August 3, 2005. *Defts' Ex.* 2. Smith, however, denies he bonded out. *Resp.* at ¶ 9.

Smith was arrested and booked into the CCDF on February 7, 2006,[2] on a charge of commercial burglary and for the enforcement of a child support order. *Defts' Ex.* 3. According to Smith, he was picked up because he had been let out of jail erroneously before his time was up. *Resp.* at ¶ 10.

When Smith was booked in, according to defendants he was considered a security risk because of his attempted escape in July of 2005. *Defts' Ex.* 1. He was put on administrative segregation. *Id.*

On February 17, 2006, Smith submitted a grievance asking why he was on lock down. *Resp.* at ¶ 13. He stated he did not need to be by himself and had no problem with the other inmates. *Id.* In response, Lt. Delaney stated he was not on any kind of lock down. *Id.*

On February 21st, Smith submitted a grievance directed to Captain Reynolds. *Resp.* at ¶ 14. He asked why he was on lock down. *Id.* He stated he wanted to be moved back with other inmates. *Id.* Smith asserts Lt. Delaney responded for Captain Reynolds and stated he was safer in pod 5. *Id.*

On April 22nd, Jailor Jason Pye, submitted the following incident report:

James Smith has been observed by myself (jailor Jason Pye) coercing the other inmates to do things that break the rule[s] of the Columbia County detention center. He continually agitates the other inmates in his pod and either bullies or forces them to do as he says, for instance today he told the other inmates to refuse to hand back the trays in pod 3 and after being told that their blankets and mattress' would be removed he threw his down on the ground and the other inmates followed his lead in disobeying the detention officers. He has tried to enrage inmates by telling them the detention officers are discriminating against them and has been caught continuously lying to the detention officers about anything that might show him responsible. And on Friday April 21, 2006 he and I quote said that he is now Brian Charles's lawyer and anything pertaining to Charles had to go through him. And Charles was explained the content of his commissary form, James Smith agitated him

---

[2]In case 06-1035 defendants submitted an exhibit, *defts' ex.* 6, showing Smith was booked into the CCDF on October 26, 2005.

>by saying the detention officers were stealing his money and he should do something about it. After hearing this Brian Charles continually beat on the door saying we were stealing from him. I then contacted michi Raspberry and she explained to Charles about his commissary to calm him down. James Smith has also been caught trying to sneak contraband into the detention center. He was caught with some rollup tobacco in a small plastic bag in which he was trying to pass out to other inmates. He continually breaks the rules of this facility to create an unsafe environment. James Smith is a serious threat to the safety and security of this facility and its workers.

*Defts' Ex.* 5 at page 5.

Smith maintains he "never made inmates do nothing out the way." *Resp.* at ¶ 16. Smith asserts he had no idea what Pye was talking about in his incident report. *Id.* at ¶ 19 & ¶ 20. Smith indicates the only time he was around Pye was when he took Smith to the Rural Health Clinic and the Magnolia Hospital for x-rays. *Id.* at ¶ 21.

When Pye wrote the incident report on April 22nd, Smith indicates he had been in general population for about four to five months. *Resp.* at ¶ 21. Smith disagrees he was trying to sneak tobacco into the facility. *Id.* at ¶ 22. He states the tobacco was already in the facility and he was merely trying to pass it to someone else when he was caught. *Id.*

According to defendants, on April 22nd the inmates in pod 3 refused to hand back their breakfast and lunch trays. *Defts' Ex.* 5 at page 2. Smith contends this only happened once but it is not clear from his response whether he contends it occurred at breakfast or at lunch. *Resp.* at ¶ 27.

When defendants were attempting to collect the lunch trays, the only detainee who did not get up was Charles. *Defts'* Ex. 5 at page 2; *Resp.* at ¶ 29. Sheriff Knighton went over to Charles' bunk and told him to get up. *Id.* The Sheriff removed a towel from around Charles' head and pushed him in the small of his back toward the door where the trays were. Charles then handed his tray to the jailor. *Id.*

Smith and the other detainees were instructed to give up their mats and blankets and told they would get them back at 10:00 p.m. *Resp.* at ¶ 30. The privileges of all detainees in pod 3 were taken away. *Defts' Ex.* 5 at page 3. Smith maintains the detainees in pod 3 had already had their privileges taken away when he refused Lt. Delaney's request to ask the detainees to give up their cigarettes and lighters. *Resp.* at ¶ 31. Smith indicates he told her it was her job to come and find those items herself. *Id.*

Smith was placed in administrative segregation on May 6th. *Resp.* at ¶ 33. According to defendants' records, Smith was released from administrative segregation on May 11th. *Defts' Ex.* 6. Smith, however, contends he stayed in pod 5 on lock-down until he was transferred to the Arkansas Department of Correction (ADC). *Resp.* at ¶ 34.

On May 14th, Smith stopped Jailor Michael Richerson as he was going down the hall and told him he was going to get his "a– whipped in pod 5." *Resp.* at ¶ 35. Richerson's incident report provides as follows:

> I continued on to pod 5. Detainee Hal Barnes needed a plunger. I gave him the plunger. As I was going back to the control room, [Smith] stopped me again. I asked him what he wanted and again he stated: "I was going to get my a– whipped." I asked him just what did he mean? He then told me to "carry my a–."

*Defts' Ex.* 7 at page 1. Smith asserts he told Richerson what he meant was "them guys in pod 5 was going to give him a hard time and thats was all." *Resp.* at ¶ 36. According to defendants' records, Lt. Delaney placed Smith on administrative segregation again on May 15th following the incident with Richerson. *Defts' Ex.* 7 at page 2.

Smith cannot recall the date of his transfer to the ADC. *Resp.* at ¶ 39. Although it is not clear from the summary judgment record when Smith was transferred to the ADC, Smith notified

the court of a change of address to a unit of the ADC in these consolidated cases on July 18, 2006 (Doc. 14 filed in 1:06-cv-01034).

While at the CCDF, Smith was able to shower. *Resp.* at ¶ 42. He had adequate clothing. *Id.* at ¶ 44. He had a bunk, mattress, or blanket to sleep with. *Id.* at ¶ 46. He has not identified any inadequacies in the diet he received. *Id.* at ¶ 40.

He received legal mail although he believes it was sometimes at least a week late and he believes he may not have received some mail at all. *Resp.* at ¶ 41. His attorney could visit him at the jail or communicate with him by phone or mail. *Id.* at ¶ 45.

### 2. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case

founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

Defendants have now moved for summary judgment on both of Smith's claims. I will address each claim separately.

#### *A. Unconstitutional Conditions of Confinement*

Smith contends the conditions under which he was held at the CCDF were unconstitutional. It is not clear from the summary judgment record when during his confinement at the CCDF Smith's status changed from that of a pretrial detainee to a convicted inmate. However, as the Court of Appeals for the Eighth Circuit has adopted the same legal standard for detainees that applies to convicted inmates, the date of his conviction becomes irrelevant for purposes of determining whether defendants are entitled to summary judgment on this issue. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006)(adopting the Eighth Amendment's deliberate indifference standard as the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Cruel

and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

In *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994), the court noted that "[c]onditions of confinement . . . constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human needs such as food, warmth, or exercise. Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.'" *Whitnack,* 16 F.3d at 957 (*quoting Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321, 2327, 115 L. Ed. 2d 271 (1991)).

Smith makes only conclusory allegations that he was subjected to unconstitutional conditions of confinement. He does not support his allegations with any factual details.

He concedes he had adequate clothing. *Resp.* at ¶ 44. He was allowed to shower. *Resp.* at ¶ 42. He had a bunk, mattress, or blanket to sleep with. *Resp.* at ¶ 46. He has identified no inadequacies in the meals. *Resp.* at ¶ 40. He had opportunities to exercise. *Resp.* at ¶ 8 & ¶ 43. Smith's claim therefore fails as a matter of law because he has not identified a single identifiable human need that he was deprived of.

### B. Confinement to Administrative Segregation

As noted above, it is not clear from the summary judgment record when Smith's status went from that of a pretrial detainee to that of a convicted inmate. I note that information available on the public website for the Arkansas Department of Correction, www.arkansas.gov/doc/inmate_info/search/php?dcnum+096264, (information obtained on August 9, 2007), indicates Smith was sentenced in Columbia County on May 18, 2006, and initially received into the ADC on June 6, 2006. Fed. R. Evid. 201. As Smith was a pretrial detainee throughout most of the period of time he was held at the CCDF, I will analyze him claim under the standards applicable to pretrial detainees.

Under the Due Process Clause of the United States Constitution, a pretrial detainee may not be punished prior to an adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "We [therefore] begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Rapier v. Harris*, 172 F.3d 999, 1002 (7th Cir. 1999). *See also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Pretrial detainees are presumed innocent and may not

be punished."). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

"Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell*, 441 U.S. at 537. In determining whether a particular restriction constitutes a permissible restriction or amounts to impermissible punishment, the court first asks "whether the restriction is based upon an express intent to inflict punishment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002)(citations omitted). If "there is no indication of such an express intent," the court next considers "whether punitive intent can be inferred from the nature of the restriction." *Valdez*, 302 F.3d at 1045.

In this regard, the Supreme Court in *Bell* held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. "An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted).

In *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002), the Seventh Circuit stated:

> A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less. But no process is required if he is placed in segregation not as punishment but for managerial reasons. Suppose for example that the only vacant cell left in the jail was in the segregation ward when a new prisoner arrived; placing him in that cell would be a managerial decision. Or suppose, . . . that a prisoner was placed under particularly restrictive conditions of confinement at the jail because he was

> considered a suicide risk. Again, no hearing would be required. Ditto if he was placed in segregation to protect himself from other prisoners, or to protect jail staff from his violent propensities. As long as the purpose was indeed preventive rather than a punitive one, he would not be entitled to notice and a hearing. . . . In none of these cases would a hearing be practicable, or even useful, because managerial decisions do not have the character of rulings applying legal standards to facts, the kind of rulings for which adjudicative hearings are designed.

*Id.,* 286 F.3d at 438. *See Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Requiring a pretrial detainee to work or be placed in administrative segregation is punishment. . . . Regardless of whether the detentions are classified as 'administrative,' if a pre-trial detainee must remain in a lock-up area if he does not work, the detention amounts to punishment.").

In this case, Smith was placed on administrative segregation when he was booked into the CCDF on February 7, 2006. *Defts' Ex.* 3; *Defts' Ex.* 1. Defendants' records indicate Smith was in administrative segregation because they considered him to a threat to the safety and security of the facility. *See e.g., Defts' Ex.* 4. During his prior incarceration at the CCDF in July of 2005, Smith was in the pod when the inmates attempted to escape and was one of the inmates charged with escape from a correctional facility. *Defts' Ex.* 2 at page 1; *Resp.* at ¶ 10.

It is not clear when Smith was removed from administrative segregation, but on April 22, 2006, he states he had been in the general population for four or five months.[3] *Resp.* at ¶ 21. Smith was placed back in administrative segregation on May 6th, *resp.* at ¶ 33, released on May 11th, *defts' Ex.* 6, and placed back in administrative segregation again on May 15th as a result of his conversation with Richerson, *resp.* at ¶ 37.

I believe defendants are entitled to summary judgment on this claim. "[M]aintaining jail security comprises an appropriate justification for inflicting restrictions on pre-trial detainees."

---

[3]Defendants' records indicate Smith was not booked back into the CCDF until February 7, 2006. *Defts' Ex.* 3.

-11-

*Zarnes*, 64 F.3d at 291. "A purely administrative reason for placing a pretrial detainee into segregation may be "to protect jail staff from [the detainee's] violent propensities." *Higgs*, 286 F.3d at 438. The materials submitted to the court indicate Smith was one inmate assigned to a pod when the inmates in that pod attempted to escape, was reported to have on a number of occasions caused unrest among the inmates, and made what was considered a physical threat towards a guard. Defendants documented their reasons for placing Smith in administrative segregation and his placement in administrative segregation was reviewed. When plaintiff questioned the reason he was on administrative segregation, he was told it was for his own safety and the security of the facility. *Defts' Ex.* 4 at pages 2-4.

Defendants have established they legitimately viewed Smith as a threat to the safety and security of the facility. There are no genuine issues of material fact that preclude entry of summary judgment in their favor on this claim.

### 4. Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 19) be granted and these consolidated cases be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **10th day of August 2007.**

/s/ Barry A. Bryant  
HON. BARRY A. BRYANT  
UNITED STATES MAGISTRATE JUDGE